1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **I.K., by and through his parents and guardians E.K. and M.K., and E.K. and M.K. individually,**<br><br>                              **Plaintiffs,**<br><br>          **v.**<br><br>**SYLVAN UNION SCHOOL DISTRICT, TRACY BARRIES, in his individual and official capacity and RUSS ANTRACOLI, in his individual and official capacity,**<br><br>                              **Defendants.** | **09-CV-01115-OWW-SMS**<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO STAY PROCEEDINGS (Doc. 11)** |

## I. INTRODUCTION

The parents of "I.K.," a minor child and former student in the Sylvan Union School District, initiated this federal lawsuit months after they filed a state court lawsuit in Stanislaus County Superior Court. Before the court is a motion to stay brought by Defendants Sylvan Union School District ("SUSD" or "School District"), Tracy Barries and Russ Antracoli (collectively, "Defendants"). Defendants request a stay of this federal lawsuit while the state court lawsuit proceeds. The following background facts are taken from the parties' submissions in connection with the motion and other documents on file in this case.

## II. BACKGROUND

**A.   State Court Lawsuit**

On March 25, 2009, I.K.'s parents filed a civil lawsuit against Defendants SUSD, Barries and Antracoli in Stanislaus County Superior Court. Defendants filed a demurrer to the original complaint. In response to the demurrer, on June 22, 2009,

1

Plaintiffs filed a first amended complaint (Doc. 13, Ex. A) which is now the operative state court pleading.

**1.   <u>General Allegations Of The State Court Complaint</u>**

**a.   <u>The Parties</u>**

I.K., born December 5, 1995, is a student with a disability, autism.  At all relevant times I.K. was a student at Mary Ann Sanders Elementary School, a school in the SUSD.  Defendant SUSD is a public school district in California.  Defendant Barries is a learning assistant formerly assigned to I.K. and employed by the School District.  Defendant Antracoli is the principal of Mary Ann Sanders Elementary School.

**b.   <u>Background On I.K. And His Autism</u>**

I.K. was born and resided in Finland until July 2005 when he and his family moved to Modesto, California.  While in Finland, I.K. was diagnosed with Attention Deficit Hyper Disorder and prescribed medication.

In September 2005, I.K. began schooling in the SUSD in a special education class.  On September 21, 2006, a physician diagnosed I.K. with autism.  As part of I.K.'s autism, he exhibited several maladaptive behaviors in the school setting including non-compliance with authority and temper tantrums.  To address these behaviors, a Board Certified Behavior Analyst ("BCBA") with Genesis Behavior Services conducted a Functional Behavioral Assessment ("FBA") of I.K. At the behest of the School District, this analyst also wrote a Behavior Support Plan ("BSP") for I.K.  The BSP contained preventive techniques such as "Don't reinforce maladaptive behavior."  On March 5, 2007, the BSP was presented at an Individualized Education Program ("IEP") meeting.  On March 13,

2

2007, I.K.'s parents agreed to implementation of the plan.

On May 12, 2008, Genesis developed an additional BSP for I.K.'s non-compliant behavior.   This BSP called for certain consequences if I.K. exhibited non-complaint behavior including withholding preferred items and positive attention.   Genesis also developed a BSP for I.K.'s aggressive behaviors.

### c.   I.K.'s Behavior In The 2008-09 School Year

During the start of the 2008-09 school year, I.K. was introduced to his learning assistant, Barries, who was supposed to be trained for roughly 30 hours on behavior intervention techniques by Genesis Behavior Center, Inc.   Barries, however, only received between 25-28 hours of training.   Genesis was called multiple times to re-train Barries on how to implement I.K.'s BSPs and how to work with I.K.   The complaint specifies various incidents involving I.K.'s behavior and Barries's response.

#### i.   The Mrs. Forcade Incident

At the start of the 2008-09 school year, Antracoli and Mrs. Forcade, I.K.'s then former 4th grade teacher, gave I.K. advance permission to visit Forcade and "say hello."   On August 7, 2008, when I.K. tried to visit Forcade's classroom to say hello, Barries stated that I.K. could not do so and blocked the entryway into Forcade's classroom.   I.K. became very upset.   I.K. spit on and hit Barries who then grabbed and restrained I.K.

#### ii.   The School Assembly Incident

SUSD contracts with the Stanislaus County Department of Education ("SCOE") to provide autism and behavior services and assessments for the School District's students.   On August 28, 2008, Deb Brown, autism specialist from SCOE and Patty Giron, an

3

1  "inclusion teacher" from SCOE, conducted an observation and
2  assessment of I.K.  Brown and Giron were under contract with SUSD
3  to perform the observation and assessment.

4  　　During Brown and Giron's visit they assisted Barries in
5  removing I.K. from his classroom to a school assembly.  They held
6  I.K.'s wrists and forced him to walk.  I.K. became very upset by
7  these actions and was unable to express his desire to be freed.
8  I.K. attempted to break out of the hold, and spat and yelled at his
9  captors, but they continued to restrain him.  I.K. escaped their
10 grasp and put water on Brown and Giron with his water bottle.  I.K.
11 then took off his shirt.  Brown and Giron instructed I.K. to put on
12 his shirt but he refused and took off his pants as well.  Brown and
13 Giron instructed I.K. to go the bathroom and get dressed, which he
14 did.  I.K.'s mother was contacted to pick up I.K. from school.
15 According to Barries's behavioral log, I.K.'s episode resulted in
16 a suspension.  I.K.'s parents, however, never received a formal
17 suspension form from the School District and I.K. returned to
18 school the next day.

19 　　In a September 10, 2008, letter addressed to I.K.'s parents,
20 Antracoli stated "[w]e are working with Genesis to revise the
21 current BSP, and have the authority to do a Functional Behavioral
22 Analysis; however with the seriousness of the current behaviors
23 that are new this year and in order to get the best possible
24 picture and information for [I.K.] we need to do an Functional
25 Analysis Assessment" ("FAA").  I.K.'s parents consented to a FAA.

26 　　　　　　　iii. <u>Mr. Barries Spitting Incident</u>

27 　　　　On September 15, 2008, I.K. came home from school and informed
28 his mother that he had spit on Barries and that Barries spat on

**4**

him.   I.K. was upset, cried, and had difficulty processing why someone would spit on him.   No incident report was filed on behalf of the school nor did Barries include data on the incident in I.K.'s behavioral log.

When I.K. returned to school on September 16, 2008, I.K. asked Barries why Barries had spit on him.   According to I.K., Barries apologized.   I.K. apparently told his swim coach that Barries apologized and I.K.'s mother also learned of the apology.   The next day, I.K.'s mother thanked Barries for apologizing to I.K. but Barries denied issuing an apology.   This greatly confused and upset I.K.

I.K.'s mother wrote a letter to Antracoli detailing the spitting incident on September 15, 2008.   She requested that the school investigate and report back.   She also expressed concern about SUSD's failure to properly use the communication log, which was part of I.K.'s October 26, 2007, IEP. Antracoli responded to I.K.'s mother stating "[i]n response to your oral concerns regarding Mr. Barries, I gave you the District Uniform Complaint Form to submit a formal complaint if you chose to do so." Antracoli provided no data on the spitting incident.

### iv.   The Leg Pulling Incident

On September 18, 2008, while inside an office room, I.K. jumped on a table.   Without first instructing I.K. to get down, Barries pulled I.K. by his leg and I.K. fell to the floor, hitting his tailbone.   I.K. then pulled down his pants and Antracoli locked the door and closed the blinds.

Upon retrieving I.K. from school, I.K.'s mother noticed I.K. hunched over and holding his lower back.   I.K. told his mother

about the incident.  I.K.'s mother took I.K. to the doctor to have his back examined.  The doctor confirmed that I.K. would be sore in that area and a bruise would form on his tailbone.  The doctor contacted the police, and I.K.'s parents filed a police report against Barries.  I.K. was suspended from school for this incident. When I.K.'s mother requested a copy of the incident report prepared by Barries, Antracoli indicated there was no such report.

### v.   The Sunglasses Incident

Also on September 18, 2008, Barries purposely broke I.K.'s sunglasses to punish I.K. for his actions.  Barries knew that I.K. needed these sunglasses because of his sensitivity to light and that I.K. fixated on them as part of his autism.

### d.   The Uniform Complaints

I.K.'s parents filed Uniform Complaints with the SUSD regarding the leg pulling incident and the school assembly incident.  The SUSD determined that the complaints lacked merit and declined to take disciplinary action.  The investigation, however, revealed that a student witnessed "two employees holding [I.K.] in a manner . . . more firm than necessary."

### e.   L.K.'s Trip To Finland, Principal's Antracoli's Alteration Of The Absent Dates, And The Truancy Notice

I.K. has a sister, L.K., who was also a student in the SUSD. On December 1, 2008, the father informed the School District that L.K. would be going to Finland to visit her grandmother who was diagnosed with cancer.  Apparently I.K. would remain behind.  The father filled out a short-term independent study contract with the SUSD which allowed L.K. to complete her assignments away from school.  The father wrote that L.K. would be absent for a total of

fifteen (15) days from *December 1*, 2008, through December 19, 2008. Antracoli, however, purportedly altered the independent study contract to reflect that L.K. would be absent from *December 4*, 2008, through December 19, 2008, for a total of twelve (12) days of absence. This left three (3) days of unauthorized absence.  In a letter to L.K.'s (and I.K's) parents dated December 11, 2008, Antracoli stated that L.K. was reported to the Superintendent as being truant for missing school on December 1-3 without a valid excuse.  Given that the parents were already "distraught with the school over I.K.'s education and their family emergency, this action was particularly outrageous and caused them a great deal of distress."

### 2. Claims In The State Court Complaint

The operative state court pleading, i.e., the first amended complaint, includes causes of action for battery, assault, intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), negligent supervision, and violation of the Unruh Civil Rights Act.[1]  These claims center around (i) I.K.'s various behavioral incidents and how I.K. was physically handled, and (ii) Antracoli's alteration of L.K.'s dates of absence and the associated truancy notice.

## B. Federal Lawsuit

About three months after initiating the state court action and two days after filing the first amended state court complaint, on June 24, 2009, Plaintiffs filed a complaint against Defendants in

---

[1] The original state court pleading included a claim under 42 U.S.C. § 1983 which Plaintiffs omitted in their subsequent pleading.

federal court.  On August 14, 2009, Plaintiff filed a first amended federal complaint (Doc. 10) which is now the operative federal pleading.

Based on a review of the pleadings, there is some overlap between the state and federal lawsuits.  The named Plaintiffs and Defendants in the federal and state complaints are the same.  With some additional details, the federal complaint also covers all the same incidents as the state complaint, including the Mrs. Forcade incident, the School Assembly incident, the Barries spitting incident, the leg pulling incident, the sunglasses incident, Antracoli's alteration of L.K.'s dates of absence, and the truancy notice.

While the federal and state pleadings involve the same parties and cover some of the same events, the federal complaint is broader.  Namely, unlike the state court complaint, the federal complaint includes an appeal of an administrative decision by an Administrative Law Judge ("ALJ") under the Individuals with Disabilities Education Act ("IDEA").  The federal lawsuit also differs by substantive claims not specifically raised in the state court complaint, i.e., the federal complaint asserts statutory claims under the IDEA,[2] the Rehabilitation Act of 1973, and 42 U.S.C. § 1983, none of which are advanced in the state court complaint.

1.   The ALJ'S Decision

As explained in the federal complaint:

43. Between September 30, 2008 and October 15, 2008, three IEP meetings, including a Manifestation

---

[2] This claim seeks review of the ALJ's decision.

**8**

Determination Hearing, took place. During all of these meetings, the District failed to allow [I.K.'s] Parents to meaningfully participate in the IEP process. This occurred through the District's control over the discussion of certain programs and services and through its predetermination of what placement I.K. would be offered. During many of these meetings, the District claimed that it was offering I.K. a FAPE.

44.   On November 7, 2008, I.K., by and through his parents, through their counsel, filed an amended complaint with the Office of Administrative Hearings, identified as Case No. 2008100702. The amended complaint alleged that the District denied Plaintiff a Free and Appropriate Public Education (FAPE) by failing to provide him with necessary supports and in several areas and failed to provide him with appropriate assessments. The amended complaint also alleged that the District violated several provisions of the Hughes Bill (5 C.C.R. 3052), a California statute over which OAH has jurisdiction. On November 10, 2008, the SUSD filed a complaint regarding the appropriateness of a psychological evaluation, identified as Case No.2008110371. On December 3, 2008, the cases were consolidated.

   . . . .

4[7]. On February 2, 2009, a Pre-Hearing Conference took place before OAH. During the hearing, the ALJ excluded several issues I.K. sought to address at the hearing. Specifically, she excluded issues regarding the appropriateness of a Functional Analysis Assessment (FAA) conducted by the District, the District's failure to allow parents to meaningfully discuss theory of mind/pragmatics/social skills in a behavior based home program, the District's failure to provide a home behavior program during the 2006 - 2007 school year and the District's failure to consider Parents requests for placement and concerns with his aide.

4[8].  After receiving these rulings, Plaintiffs filed a Motion for Reconsideration/Motion to Amend on February 5, 2009, requesting that OAH change its PHC rulings or allow Plaintiffs to amend the complaint in order to plead the excluded issues with more specificity. This motion was denied by OAH, and Plaintiffs filed an objection to this denial on February 19, 2009.

4[9].   On February 23, 26, 27 and March 4, 5 and 11, 2009, a hearing was held before an ALJ from OAH. Plaintiffs' issues, as determined by the ALJ, were as follows:

   1. During the 2006 - 2007 school year (SY), did the

District appropriately assess Student's:

    A. Psychoeducational functioning; and
    B. Speech and Language?

2. During the 2007 - 2008 SY, did the District appropriately assess Student's:

    A. Psychoeducational functioning; and
    B. Speech and Language?

3. Was the District's psychoeducational assessment completed on October 15, 2008, appropriate?

4. Did the District deny Student a free appropriate public education (FAPE) during the 2006 - 2007 SY by failing to provide him with appropriate:

    A. Behavioral/social-emotional services, including:

        i. Consultation;
        ii. Behavioral aide support;

    B. Reading (decoding, comprehension), self-help and living skills goals?

5. Did the District deny Student a FAPE during the 2007 - 2008 SY by:

    A. Failing to provide his parents with procedural safeguards regarding suspensions on May 17, 2008;

    B. Failing to provide him with in-home program to teach theory of mind, preteach and reinforce academic subjects;

    C. Failing to provide him with an appropriate behavioral aide;

    D. Failing to provide him with appropriate reading (decoding, comprehension), self-help and living skills goals?

6. Did the District deny Student a FAPE during the 2008 - 2009 SY by:

    A. Failing to provide his parents with procedural safeguards notice regarding suspensions on September 9, 2008 and September 18, 2008;

    B. Predetermining the offer at the September 30, 2008, October 7, 2008 and

10

October 15, 2008 IEP team meetings;

C. Failing to provide him with in-home program to teach theory of mind, preteach and reinforce academic subjects until October 2008 and after October 2008, and failing to provide a home program to address all of his specific needs;

D. Failing to implement his behavioral support plans (BSPs) and failing to provide a trained aide:

E. Failing to provide him with appropriate self-help and living skills goals; and

F. Failing to provide him with appropriate services during his suspension and appeal to allow him to participate in the general education environment?

Additionally, at issue for the District was whether its October 15, 2008 psychoeducational assessment was appropriate. The issues, as ultimately determined by the ALJ in his decision, excluded issues regarding Defendant's failure to follow the Hughes Bill (5 C.C.R. 3052).

[50]. On May 4, 2009, the ALJ issued a decision in the case. The ALJ determined that Plaintiff prevailed on issues 1(b) and 2(b), finding the District was obligated to assess I.K. in the area of pragmatics. On all other issues, the ALJ determined that the District prevailed.

The ALJ decision provides the basis for the first substantive claim in the federal complaint.

    2.   <u>Claims In The Federal Complaint</u>

        a.   <u>Violation Of IDEA</u>

The first claim is for violation of the IDEA, 20 U.S.C. § 1415 et seq., and is asserted against the District. This claims seeks review of the ALJ's decision. Plaintiffs allege:

5[2]. Pursuant to 20 U.S.C. [§] 1415(i)(2)(A), any party aggrieved by the findings and decisions of a due process decision shall have the right to appeal the decision in a district court of the United States.

11

5[3].  Plaintiffs, as the aggrieved party in the due process hearing, hereby appeal the decision and the findings and determinations made by the ALJ except those regarding issues 1(b) and 2(b) involving the determination that SUSD denied I.K. a FAPE by failing to assess for pragmatics deficits. Plaintiffs appeal on the basis that the ALJ erred in several ways, including, but not limited to, making incorrect factual findings, incorrectly applying the law, failing to apply relevant law and regulation and failing to render a decision on all of Plaintiffs' issues.

5[4].  Furthermore, Plaintiffs appeal the ALJ's decision during the Pre-Hearing Conference to exclude issues from the hearing.

As a remedy, Plaintiffs request, among other things, "[a]n order reversing the [ALJ's] decision," "[c]ompensatory education" for I.K., and "reimbursement for private assessments and services and future educational services."

    b.  Violation Of § 504 Of The Rehabilitation Act

Plaintiffs' second claim is for violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and is asserted against the School District.  This claim advances a few different theories of liability.  As alleged:

5[8].  Plaintiff I.K. is a qualified individual with a disability.

5[9].  Defendants unlawfully discriminated against Plaintiffs on the sole basis of disability.

[60].  Solely by reason of his disability, Plaintiff has been excluded from participation in, denied the benefit of, and subjected to discrimination in his attempts to receive full and equal access to the facilities, programs, services and activities offered by Defendant SUSD.

[61]. 34 C.F.R. § 104.61 prohibits school districts from intimidating, coercing, or retaliating against individuals because they engage in activities protected by Section 504. Included in the activities protected by Section 504 is the advocating for educational rights of a child. SUSD is responsible for the retaliatory actions taken against Plaintiffs E.K. and M.K. [the parents] by RUSS ANTRACOLI who sent a truancy notice to them and the

12

Superintendent regarding their daughter L.K after parents had filed a due process complaint regarding I.K.'s education and Uniform Complaints with the District.

[62]. 34 C.F.R. § 104.33 requires school district to provide education and services that are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met. Through its actions and omissions, including providing him with a 1 : 1 aide who improperly restrained and abused him and allowing its contractors to restrain him, SUSD provided I.K. with an unequal education compared with his non-disabled peers, in that they were not subjected to and did not have their education adversely impacted by this treatment from their teachers and aides. The stress and anxiety 1.K endured as a result of these actions denied him meaningful access to an appropriate education.

[63]. The education was also discriminatory and not designed to meet I.K.'s needs as equally as non-disabled students because the District claimed the education it offered him was a FAPE. By law, this was substantially less than the education level the District attempted to provide for other students, as it was their mission to 'educate students to their fullest potential within a safe, supportive environment.'

[64]. These actions were intentional discrimination, or at minimum, involved deliberate indifference to I.K.'s rights.

Plaintiffs request damages for the unlawful discrimination/retaliation.

c.   <u>Section 1983</u>

The third claim asserts Fourth, Fourteenth, and First Amendment violations under § 1983. These constitutional claims are asserted against Barries and Antracoli in their individual capacities. The Fourth and Fourteenth Amendment claims focus on Barries's conduct toward I.K. The First Amendment claim relates to Antracoli's alteration of L.K.'s dates of absence and the truancy notice. Plaintiffs allege:

6[8].     The acts and omissions of SUSD employee TRACY BARRIES, under color of law, described herein, constitute a deprivation of I.K.'s constitutional right to be free

13

from unreasonable government seizures under the Fourth Amendment to the United States Constitution. By improperly restraining him, assisting others in restraining him and pulling him off a desk, TRACY BARRIES unreasonably seized I.K. in violation of his constitutional rights. The actions were willful, intentional and oppressive. The actions constituted a restraint on liberty such that a reasonable person would not have felt free to leave. Mr. ANTRACOLI, as the principal of the school and person in charge of supervision, is also liable for the improper uses of restraint because he directed Mr. BARRIES not to follow I.K's BSP and was aware that he was not following it. By creating and allowing an atmosphere where the plan did not have to be followed, he allowed Mr. BARRIES, Deb Brown and Patty Giron to commit the unlawful actions. He is also liable as a supervisor for failing to replace Mr. BARRIES as I.K's 1 : 1 aide despite knowledge that he was not able to successfully implement the plan. The actions and omissions of Mr. BARRIES and Mr. ANTRACOLI caused I.K. to suffer physical injury and a great deal of mental and emotional distress.

6[9]. The substantive due process component of the Fourteenth Amendment forbids the government from depriving a person of life, liberty or property in a way that shocks the conscience. The acts and omissions SUSD employee TRACY BARRIES, under color of law, described herein constitute a deprivation of I.K.'s substantive due process rights under the Fourteenth Amendment. By spitting on him and pulling him off a desk, TRACY BARRIES engaged in actions that shock the conscience and were an arbitrary exercise of government power. The actions were willful, intentional and oppressive and served no legitimate purpose Mr. ANTRACOLI, as the principal of the school and person in charge of supervision, is also liable for the improper uses of restraint because he directed Mr. BARRIES not to follow I.K's BSP and was aware that he was not following it. By creating and allowing an atmosphere where the plan did not have to be followed, he allowed Mr. BARRIES to commit the unlawful actions. He is also liable as a supervisor for failing to replace Mr. BARRIES as I.K's 1 : 1 aide despite knowledge that he was not able to successfully implement the plan. The actions and omissions of Mr. BARRIES and Mr. ANTRACOLI caused I.K. to suffer physical injury and a great deal of mental and emotional distress.

[70]. Furthermore, Mr. ANTRACOLI, acting under color of state law on behalf of SUSD, retaliated against E.K. and M.K. for their exercise of their first amendment free speech rights. Plaintiffs constitutionally protected speech activities were the filing of a Due Process complaint against SUSD for failing to provide I.K. with an appropriate education and filing a Uniform Complaint

14

with the school. In violation of Section 1983, Mr.
ANTRACOLI retaliated against them when he unlawfully
changed the dates of their daughter L.K.'s independent
study form and sent a truancy letter to them and the
Superintendent. This act was willful, intentional and
oppressive. Defendants actions described herein have
caused Plaintiffs to suffer discriminatory and
retaliatory injuries that would chill a person of
ordinary firmness from continuing to engage in those
activities, and Defendants' conduct has been
substantially motivated as a response to Plaintiffs'
exercise of the above listed constitutionally protected
activities. The actions caused E.K. and M.K. to suffer a
great deal of mental and emotional distress.

Plaintiffs request damages for the constitutional violations.

C.   <u>Defendants' Motion</u>

Defendants request a "stay," not a dismissal, of Plaintiffs'
federal lawsuit.  In support of their request, Defendants invoke
four separate legal doctrines that stem from four different cases:
*Landis v. North American Co.*, 299 U.S. 248 (1936); *Colorado River
Water Conservation District v. United States*, 424 U.S. 800 (1976);
*Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941); and
*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

As revealed in declarations, prior to this motion, the parties
attempted to reach a stay agreement.  With respect to the federal
lawsuit, it appears that Defendants once proposed an offer to
proceed with the IDEA claim and stay only the § 504 and § 1983
claims.  Plaintiffs, however, did not accept this offer and instead
proposed to combine both cases in federal court.  The parties never
resolved the issue and this motion followed.

Plaintiffs contend that Defendants' motion should be denied
altogether.  Alternatively, Plaintiffs argue that "should the court
deem it appropriate to stay a portion of the case, Plaintiffs
request only the Section 504 and Section 1983 claims be stayed,"

and that the IDEA claim proceed in federal court. (Doc. 21 at 13.)

### III.   DISCUSSION AND ANALYSIS

"The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *NOPSI v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (internal quotation marks omitted).   Nevertheless, *Landis*, *Colorado River*, *Pullman* and *Burford* provide four separate grounds on which to grant a stay, and each ground has its own set of doctrinal criteria.

A.   *Landis*

Under *Landis*, a district court has the "power to stay proceedings" as part of its inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." 299 U.S. at 254-55. As explained in *Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 863-64 (9th Cir. 1979), under *Landis*:

> A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.

The Ninth Circuit has prescribed criteria for determining whether a *Landis* stay is appropriate:

> Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among those competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

16

*Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (quotation marks omitted).  "If there is even a fair possibility that the stay . . . will work damage to some one else," the party seeking the stay "must make out a clear case of hardship or inequity." *Landis*, 299 U.S. at 255 (internal quotation marks omitted); *see also Lockyer*, 398 F.3d at 1112.[3]

A *Landis* stay should not be granted "unless it appears likely the other proceedings will be concluded within a reasonable time in relation to the urgency of the claims presented to the court." *Leyva*, 593 F.2d at 864.[4]  A district court's decision to grant or deny a *Landis* stay is a matter of discretion. *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007); *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003).

    1.   <u>Weighing The Competing Interests</u>

        a.   <u>Possible Damage That May Result From Granting A Stay</u>

If a stay of this action is granted, at least one form of potential damage that Plaintiffs could experience is a delay in obtaining money damages on their federal claims. Delayed reception of ordinary money damages, however, is not a type of potential damage that is particularly weighty under a *Landis* analysis. *See*

---

[3] In *Dependable Highway Express, Inc. v. Navigators Insurance Co.*, 498 F.3d 1059 (9th Cir. 2007), the Ninth Circuit interpreted *Landis*' reference to "some one else" as including a party to the lawsuit in which the stay is requested. *See id.* at 1066 ("In this case, there is more than a 'fair possibility' that the stay will 'work damage' to Dependable.").

[4] The parties have not estimated when the state case will conclude.

*Lockyer*, 398 F.3d at 1110.  **Plaintiffs, however, have a claim under the IDEA which provides a remedy that is different from ordinary money damages.**

In an IDEA action, like this one, the district court "(i) shall receive the records of the [state] administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, *shall grant such relief as the court determines is appropriate*." 20 U.S.C. § 1415(i)(2)(C)(i)-(iii) (emphasis added). The statutory authority to "grant such relief as the court determines is appropriate" gives the district court broad authority to fashion appropriate relief. *Forest Grove Sch. Dist. v. T.A.*, __ U.S. __, 129 S. Ct. 2484, 2490, 2492 (2009).

Appropriate relief under the IDEA can include "compensatory education" when a student has been denied a FAPE, and reimbursement for the cost of services that a school wrongfully failed to provide. *See Park ex rel. Park v. Anaheim Union High Sch. Dist.,* 464 F.3d 1025, 1033 (9th Cir. 2006); *Moseley v. Bd. of Educ.,* 483 F.3d 689, 693-94 (10th Cir. 2007).  Compensatory education is considered an "equitable remedy." *Parents of Student W. v. Puyallup Sch. Dist.*, *No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). Compensatory education often refers to "educational services ordered by the court to be provided prospectively to compensate for a past deficient program." *G. ex rel. Ssgt RG v. Fort Bragg Dependent Schs.*, 324 F.3d 240, 253 (4th Cir. 2003). "Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given

**18**

period of time to provide a FAPE to a student." *Id.* at 254. "[A] child eligible for special education services under the IDEA may be entitled to further services, in compensation for past deprivations, even after his or her eligibility has expired." *Me. Sch. Admin. Dist. No. 35 v. Mr. R.*, 321 F.3d 9, 18 (1st Cir. 2003).

Tort-like "[m]oney damages for retrospective and non-educational injuries" are not appropriate under the IDEA. *Blanchard v. Morton Sch. Dist.*, 420 F.3d 918, 921 (9th Cir. 2005). Rather, appropriate relief under the IDEA "is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W.*, 31 F.3d at 1497.

Plaintiffs' claim under the IDEA seeks review of the ALJ's determination that I.K. was not denied a FAPE in the 2006-07, 2007-08, and 2008-09 school years.  Contending that I.K. was denied a FAPE during these years, Plaintiffs seek "[c]ompensatory education, [and] reimbursement for private assessments and services and future education services" as a remedy. (Doc. 10 at 18) (emphasis added.). Staying the federal litigation means delaying I.K.'s ability to prove his case and obtain compensatory education or other relief "designed to ensure that [he] is appropriately educated within the meaning of the IDEA." *Parents of Student W.*, 31 F.3d at 1497.

Defendants engage a common ploy in attempting to downplay the significance of delaying appropriate relief for I.K. under the IDEA and argue that because I.K. is now in a different school district, an award under the IDEA will "only result in dollars, which can be used for I.K.'s education in whichever forum they are recovered in." (Doc. 12 at 4.)  However, even if appropriate relief under IDEA results "in dollars" to fund remedial educational services for

19

I.K. in his new locale, delaying such a remedy could prove detrimental to I.K.'s educational progression as he gets older and does not receive compensatory education which impairs his academic advancement. A delay in I.K.'s reception of compensatory education or other appropriate relief under the IDEA is a cognizable form of "*possible* damage which may result from the granting of a stay," *Lockyer*, 398 F.3d at 1110.[5]

Another form of potential damage to Plaintiffs if this case is stayed is the inability, during the stay, to conduct timely discovery and gather evidence as to non-overlapping aspects of the federal litigation.[6] For example, in connection with the IDEA claim, which is unique to the federal action, "additional evidence" may be received on this claim as a supplement to the administrative record. 20 U.S.C. § 1415(i)(2)(C)(ii); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473 (9th Cir. 1993). Staying the federal action may prevent Plaintiffs from conducting discovery and gathering "additional evidence" needed to advance their IDEA claim.

Like the IDEA claim, part of Plaintiffs' § 504 discrimination claim also appears unique to the federal action. Among other things, the § 504 claim includes the allegation that the School

---

[5] At this time, no opinion is expressed on whether I.K. was actually denied a FAPE or whether an award of compensatory education or other relief is warranted.

[6] Defendants could have requested a more limited stay that did not impact discovery. *See Clinton v. Jones*, 520 U.S. 681, 706-07 (1997) (recognizing that trial of an action may be stayed even though discovery proceeds). Defendants, however, requested a stay of "this federal case" in its entirety, and nothing in the briefing indicates that Defendants are willing to proceed with federal discovery.

20

District failed to provide I.K. with a FAPE. *See Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008) (discussing the differences and similarities between a FAPE in the IDEA context and a FAPE in the § 504 context); *see also Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1246 (10th Cir. 2009). The complaint alleges that the education "designed" for I.K. was substantially less than the education the School District endeavored to provide to its non-disabled students. This type of discrimination claim is not asserted in the state court complaint.[7] The stay requested by Defendants could preclude Plaintiffs from obtaining discovery on this claim or any other matter not mirrored in the state action.

As to non-overlapping aspects of the federal case, delaying discovery and the gathering of evidence could be harmful to Plaintiffs. While the stay is in effect, through no fault of the parties, relevant evidence could be lost or destroyed, memories could fade, and pertinent witnesses could move out of the jurisdiction. *New York v. Hill,* 528 U.S. 110, 117 (2000) (recognizing that "[d]elay can lead to a less accurate outcome as witnesses become unavailable and memories fade"); *Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724 (9th Cir. 2007) (recognizing that "[d]elay inherently increases the risk that witnesses' memories will fade and evidence

---

[7]   The state court complaint does allege that Defendants violated the Unruh Civil Rights Act by, among other things, "providing [I.K.] with supports and services unequal to his typically developing peers." This claim is different from a § 504 claim predicated on the denial of a FAPE. The latter claim, unlike the former, requires "a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of [I.K.'s] educational program." *See Mark H.*, 513 F.3d at 933.

will become stale") (internal quotation marks omitted).

> **b.** **Hardship or inequity which a party may suffer in being required to go forward**

Defendants argue that it would be "extremely burdensome on the parties to have to litigate essentially the same case twice," (Doc. 12 at 3) and "[i]nsofar as the trier-of-fact in each court will be asked to make findings of fact, if a stay is not granted, conflicting findings may be reached," (Doc. 24 at 3). These arguments are unpersuasive.

First, Defendants' argument that it would be extremely burdensome to litigate "essentially the same case twice" is based on the false premise that the two actions are largely identical. There is, however, a significant portion of the federal case that has no apparent state court analog; namely, the IDEA claim is unique to the federal action. The IDEA claim encompasses a review of the ALJ's decision as to whether, among other things, the District denied I.K. a FAPE during the 2006-07, 2007-08, and 2008-09 school years. The state court action, by contrast, does not include a review of the ALJ's decision and it focuses on alleged wrongful conduct that occurred during the 2008-09 school year. The § 504 discrimination claim also is unique to the federal action to the extent it relates to the denial of a FAPE. Because a significant portion of the federal case is not mirrored in the state action, Defendants' argument that it would be extremely burdensome to have to litigate "essentially the same case twice" is overstated and unpersuasive.

Second, the evidence submitted in connection with Defendants' motion shows that Defendants offered, in August 2009, to proceed

1   with the IDEA portion of the federal case and stay the remainder.

2   Defendants' prior willingness to partially proceed in federal court

3   undercuts the notion that going forward with the entirety of this

4   case would now be "extremely burdensome" for Defendants.[8]   In

5   addition, in federal court, the electronic filing system and, when

6   authorized, telephonic appearances, obviate the burden associated

7   with traveling to court to file documents or personally appear for

8   hearings.

9        Third, insofar as the two cases are similar and "conflicting

10  findings may be reached," (Doc. 24 at 3), "the mere potential for

11  conflict in the results of adjudications does not, without more,

12  warrant    staying    exercise    of    federal    jurisdiction,"

13  *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1151 (9th Cir.

14  2007) (internal quotation marks omitted).  "[T]he possibility of a

15  race to judgment is inherent in a system of dual sovereigns and, in

16  the absence of exceptional circumstances, that possibility alone is

17  insufficient to overcome the weighty interest in the federal courts

18  exercising their jurisdiction over cases properly before them." *Id*.

19  (alteration in original) (internal citation and quotation marks

20  omitted).

21       Whatever hardship or inequity inheres in requiring Defendants

22  to go forward with this case, it does not tip the scale in favor of

23  granting a *Landis* stay when considering the totality of the *Landis*

24  factors.

25            c.   Simplifying or complicating of issues, proof,
                   and questions of law which could be expected to

26

27  ─────────────────

         [8] Defendants have not moved for a partial stay.

28

                                  **23**

<u>**result from a stay**</u>

Defendants contend that the state court and federal lawsuits have "factual issues" in common.  Defendants also identify some legal matters in the state court action which they believe, if resolved first at the state court level, will help reduce or simplify the legal issues raised in the federal lawsuit. Defendants take the position that given the overlap in the two cases, and "because determinations made in one action will be binding in the other, it makes sense to litigate one before the other," i.e., to litigate the state case first.  While Defendants' logic is not without force, a consideration of the final *Landis* factor does not point in favor of issuing a stay.

First, generally speaking, a stay of a federal case is not warranted simply because the case involves claims or issues being litigated simultaneously in a state court. *See Roden*, 495 F.3d at 1151.  "Although abstention to avoid concurrent, duplicative litigation is available in some very limited circumstances . . . the general rule remains that stated in *Kline* . . . ."  *Id.*

> Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court.  Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of res [judicata and collateral estoppel] by the court in which the action is still pending in the orderly exercise of its jurisdiction, as it would determine any other question of fact or law arising in the progress of the case.

*Kline v. Burke Constr. Co.*, 260 U.S. 226, 230 (1922).

Second, even though, based on the pleadings, there is some *factual* overlap between the two lawsuits, the factual overlap is

**24**

1    partial at best and much of it involves background information.
2    Accordingly, the degree of benefit that can be derived from
3    granting a *Landis* stay is somewhat questionable.  Even assuming,
4    however, that there is some meaningful "factual issues" that if
5    resolved in the state court action would be binding in federal
6    court and appreciably reduce the federal litigation, *when* these
7    factual determinations would become binding is an important
8    consideration.

9         A *Landis* stay should not result in "undue delay," *Dependable*
10   *Highway Express, Inc.,* 498 F.3d at 1066, and a *Landis* "stay should
11   not be granted unless it appears likely the other proceedings will
12   be concluded within a reasonable time in relation to the urgency of
13   the claims presented to the court," *Leyva*, 593 F.2d at 864.  Here,
14   Plaintiffs have stressed the importance of proceeding swiftly with
15   their federal case, particularly the IDEA claim, and the need for
16   I.K., a minor student with a disability, to obtain relief under the
17   IDEA.  As to the state court proceedings, whether the state action
18   is disposed of at summary judgment or proceeds to trial, the
19   likelihood that conclusive finality will be reached in the near
20   future remains uncertain.

21        A summary judgment motion in the state court action will not
22   conclusively resolve factual matters.  "[O]n summary judgment,
23   [California] trial courts may *not* make findings of fact, but are
24   limited to determining the existence of a factual dispute."
25   *Desaigoudar v. Meyercord*, 108 Cal. App. 4th 173, 189 (2003)
26   (emphasis added); *see also Kelsey v. Waste Mgmt. of Alameda County*,
27   76 Cal. App. 4th 590, 597 (1999) ("The trial court makes no

28
                                25

findings of fact on summary judgment . . . .").[9] **Even if the trial court determines that no factual dispute exists, and the movant obtains complete victory on summary judgment, the summary judgment order will not be entitled to preclusive effect in federal court until all appeal rights have been exhausted.** *See Franklin & Franklin v. 7-Eleven Owners for Fair Franchising,* **85 Cal. App. 4th 1168, 1174 (2000);** *Abelson v. Nat'l Union Fire Ins. Co.*, **28 Cal. App. 4th 776, 787 (1994);** *People ex rel. Gow v. Mitchell Bros.*' *Santa Ana Theater*, **101 Cal. App. 3d 296, 306 (1980);** *In re Lumbermans Mortgage Co. v. Secured Inv. of Marysville, Ltd.*, **712 F.2d 1334, 1335 (9th Cir. 1983).   If appealed, the order on summary judgment could be reversed, leading to further delay.   If the state case proceeds to jury trial, the trial date is currently scheduled for August 3, 2010, approximately eight months away.   As with a summary judgment motion, a judgment after a jury trial will not be entitled to preclusive effect until appeal rights have been exhausted.** *See Franklin & Franklin*, **85 Cal. App. 4th at 1174;** *Abelson*, **28 Cal. App. 4th at 787.   Either side could appeal the judgment rendered on the jury verdict, and a reversal could lead to a second trial with another round of testimony and exhibits.** *See Barron v. Superior Court*, **173 Cal. App. 4th 293, 300 (2009) (recognizing that an "unqualified reversal automatically remands the matter for renewed proceedings and places the parties in the**

---

[9] **Likewise, in federal litigation, a district court does not make findings of fact on summary judgment.** *See Rand v. Rowland*, **154 F.3d 952, 957 n. 4 (9th Cir. 1998);** *see also Scott v. Harris*, **550 U.S. 372, 378 (2007).**

same position as if the matter had never been heard"). Given the future summary judgment/trial date, the lack of preclusive effect until appeal rights have been exhausted, and the potential for delay in reaching finality, it cannot reasonably be predicted that the state court proceedings will be concluded and overlapping factual issues resolved within a reasonable time "in relation to the urgency of the claims presented," *Leyva*, 593 F.2d at 864, in federal court.

Third, as to purported overlap in *legal* issues, the same observations generally apply. None of the claims in the federal lawsuit are specifically asserted in the state court complaint, and the IDEA claim represents a substantial portion of the federal case raising a number of legal issues not embodied in the state court action. This difference in the two lawsuits leaves some doubt about the benefit that can be derived from granting a *Landis* stay. Even assuming, however, there is some meaningful overlap in legal issues, a state court judgment will not be entitled to preclusive effect in federal court until appeal rights have been exhausted. The future summary judgment/trial date in the state court action, the lack of preclusive effect until appeal rights have been exhausted, and the potential for delay in reaching finality makes it unlikely that the state court proceedings will be concluded and overlapping legal issues resolved within a reasonable time "in relation to the urgency of the claims presented," *Leyva*, 593 F.2d at 864, in federal court. In addition, where Defendants claim that overlapping legal issues exist, on closer examination, the significance of the overlap is overstated.

1    For example, Defendants argue that whether the "Hughes Bill
2  gives rise to a mandatory duty should be adjudicated in state
3  court." (Doc. 12 at 6.)    Defendants claim the Hughes Bill, a
4  California law, is implicated in the federal action in the IDEA
5  claim as well as in the § 1983 claim.   As to the IDEA claim, one
6  small part of this claim relates to the ALJ's decision to exclude,
7  from the due process hearing, issues regarding alleged failures
8  under the Hughes Bill.     For the § 1983 claim, there is no
9  indication that a state court determination regarding the Hughes
10  Bill, a *state* law, will resolve or narrow *federal* issues in this
11  case. *See infra* part III. C.1.

12    Defendants also contend that the state court should resolve
13  whether Antracoli's sending of the truancy notice is privileged
14  under California Civil Code § 47 and California Government Code §§
15  820.2, 820.4, and 821.6.    In the state case, the sending of the
16  truancy notice is implicated in the IIED, NIED, and Unruh Civil
17  Rights Act claims.   In the federal case, the sending of the truancy
18  notices is alleged as an act of retaliation in violation of the
19  First Amendment.    Defendants argue that, "[t]o the extent Mr.
20  Antracoli's actions were privileged or immune" as determined by the
21  state court, "this would be highly relevant evidence for this
22  [federal] court in determining whether he was entitled to qualified
23  immunity." (Doc. 12 at 6.)   Defendants continue, "i[f] the state
24  court determines that Mr. Antracoli's actions were privileged or
25  immune" under California law "then it would be reasonable for Mr.
26  Antracoli to believe his conduct was lawful." (*Id.* at 7.)

27    Defendants' attempt to inject California state law immunities

28

**28**

into the federal qualified immunity analysis is unpersuasive. *See*
*Finkelstein v. Bergna*, 924 F.2d 1449, 1453 (9th Cir. 1991)
(stating, with respect to a qualified immunity analysis, "[t]he
question before us is not whether Bergna's actions were reasonable
under state law, but whether the challenged conduct violates
clearly established federal law, here the due process clause of the
fourteenth amendment.").  The Supreme Court has noted:

> [C]onduct by persons acting under color of state law
> which is wrongful under 42 U.S.C. § 1983 or § 1985(3)
> *cannot* be immunized by state law.  A construction of the
> federal statute which permitted a state immunity defense
> to have controlling effect would transmute a basic
> guarantee into an illusory promise; and the supremacy
> clause of the Constitution insures that the proper
> construction may be enforced.

*Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 376 (1990) (internal
quotation marks omitted) (emphasis added).  As more recently
reiterated by the Ninth Circuit, "[i]t is a long standing principle
that a state may not immunize its officials from the requirements
of federal law." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1160 (9th Cir.
2000); *see also Wallis v. Spencer*, 202 F.3d 1126, 1143-44 (9th Cir.
2000).  This principle applies in the qualified immunity context.
*See Stroh,* 205 F.3d at 1160.  Accordingly, if the truancy notice
constituted actionable retaliation in violation of the First
Amendment, whether Antracoli's actions were privileged or subject
to immunity under state law is beside the point.[10]

---

[10]   There may be situations in which state law immunities are
potentially *relevant* to, but not dispositive of, a qualified
immunity defense.  For example, the Ninth Circuit has recognized
"when faced with a close question regarding whether federal law
itself is clearly established, . . . the fact that state law
immunizes similar conduct *may* tend to support an officer's claim of

In terms of simplifying or reducing the federal litigation, a picture does not readily emerge of some factual or legal benefit that will be realized in the reasonably foreseeable future by issuing a stay.  Whatever benefit Defendants perceive in staying this case and proceeding with the state action, it could take a substantial amount of time, if ever, for that benefit to materialize in a state court judgment entitled to preclusive effect.

After considering the case law and the competing interests at issue, including the possible damage which may result from the granting of a stay, the hardship or inequity which Defendants may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay, discretion is best exercised to DENY Defendants' request for a *Landis* stay.

B.   *Colorado River*

The *Colorado River* doctrine provides another ground upon which to grant a stay.  "Under *Colorado River*, considerations of 'wise judicial administration, giving regard to conservation of judicial

---

qualified immunity."  *Hopkins v. Bonvicino*, 573 F.3d 752, 776 n.15 (9th Cir. 2009) (emphasis added).  The general rule remains, however, that "[s]tate immunity law does not govern § 1983 claims."  *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996).  At this juncture, there is no indication that this case presents a "close question" as contemplated by *Hopkins*.  Even assuming the state law immunities at issue here *may* somehow tend to support Antracoli's anticipated defense of qualified immunity, it is not apparent that this support will be so meaningful as to justify giving it much weight.

resources and comprehensive disposition of litigation,' may justify a decision by the district court to stay federal proceedings pending the resolution of concurrent state court proceedings involving the same matter." *Holder v. Holder*, 305 F.3d 855, 867 (9th Cir. 2002) (quoting *Colorado River*, 424 U.S. at 817). This doctrine "is a narrow exception to the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Smith v. Central Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005) (internal quotation marks omitted).

As a threshold matter, to invoke *Colorado River*, the federal and state court actions must be "substantially similar." *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989); *see also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 277 (1988). In the Ninth Circuit, exact parallelism between the state and federal lawsuit is not required to invoke *Colorado River*; however, substantial doubt as to whether the state action will resolve the issues in the federal action precludes a *Colorado River* stay.

> '[T]he existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a [*Colorado River*] stay.' *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993). [E]xact parallelism between the state and federal proceedings is not required; *Nakash* v. *Marciano*, 882 F.2d 1411, 1416; however, any substantial doubt is sufficient to preclude a stay:
>
> > When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all . . . .

31

1  *Smith*, 418 F.3d at 1033 (quoting *Moses H. Cone Mem'l Hosp. v.*
2  *Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)) (emphasis removed);
3  *see also Holder*, 305 F.3d at 868 ("Because there is substantial
4  doubt that a final determination in the custody proceeding will
5  resolve all of the issues in Jeremiah's federal Hague Convention
6  petition [the federal action], we conclude that the district court
7  abused its discretion in staying proceedings.").

8      Here, there is, at a minimum, "substantial doubt" regarding
9  whether the state action will resolve the issues involved in the
10  federal case.  The IDEA claim, which covers numerous school years,
11  is unique to the federal action.  The various substantive issues
12  this claim presents will not be completely resolved in the state
13  action.  Under these circumstances, a *Colorado River* stay is not
14  appropriate.

15      Defendants argue that the "[r]esolution of the State Complaint
16  will be determinative of *most* of [the] issues in the the [sic]
17  Federal Complaint." (Doc. 12 at 7.)  This argument concedes that
18  not all the federal issues in this case will be resolved by the
19  state court action.  As stated in *Holder*, for *Colorado River*
20  purposes, "it is dispositive that the state court judgment will not
21  resolve *all* of the issues before the federal court." 305 F.3d at
22  870 (emphasis added); *see also Intel Corp.*, 12 F.3d at 913 n.7
23  ("Since we find that there exists a substantial doubt as to whether
24  the state court proceedings will resolve *all* of the disputed issues
25  in this case, it is unnecessary for us to weigh the other factors
26  included in the *Colorado River* analysis.") (emphasis added).
27  Defendants similarly contend that "[i]f the State Complaint is

28

32

fully litigated while the federal litigation is stayed," when the federal litigation resumes the court will then be "able to cleanly rule on matters of law and those issues and claims not already litigated in State court." (Doc. 12 at 8.)  Even assuming the truth of this argument, it too falls short of the mark.  "The decision to invoke *Colorado River* necessarily contemplates that the federal court will have *nothing* further to do in resolving *any* substantive part of the case, whether it stays or dismisses." *Holder*, 305 F.3d at 868 (quoting *Moses H. Cone*, 460 U.S. at 28) (emphasis added).

Because, at a minimum, substantial doubt exists regarding whether the state action will resolve the claims at issue in this federal case, a *Colorado River* stay is not appropriate, and the other *Colorado River* factors need not be considered. *See Smith,* 418 F.3d at 1033-34*; see also Intel Corp.,* 12 F.3d at 913 n.7. Defendants' request for a stay under *Colorado River* is DENIED without prejudice.

C.   *Pullman*

*Pullman* provides another ground upon which to grant a stay. "Abstention under *Pullman* is an equitable doctrine that allows federal courts to refrain from deciding sensitive federal constitutional questions when state law issues may moot or narrow the constitutional questions." *Spoklie v. Montana*, 411 F.3d 1051, 1055 (9th Cir. 2005) (internal quotation marks omitted). "*Pullman* abstention is appropriate when: '(1) the federal plaintiff's complaint requires resolution of a sensitive question of federal constitutional law; (2) the constitutional question could be mooted or narrowed by a definitive ruling on the state law issues; and (3)

1   the possibly determinative issue of state law is unclear.'" *Id.*

2   (quoting *San Remo Hotel v. City & County of San Francisco*, 145 F.3d

3   1095, 1105 (9th Cir. 1998)).   To invoke *Pullman* abstention, it is

4   not "necessary that the state adjudication obviate the need to

5   decide all the federal constitutional questions as long as it will

6   reduce the contours of the litigation." *Smelt v. County of Orange*,

7   447 F.3d 673, 679 (9th Cir. 2006).

8         Defendants argue that *Pullman* abstention is warranted because

9   the "State action will likely resolve the questions of whether the

10  events alleged in the Federal Complaint occurred, whether I.K. was

11  actually restrained in his movements in any way, what the

12  circumstances surrounding those events were, whether the touchings

13  were privileged or consented to, whether they were unreasonable or

14  an arbitrary exercise of government power, and whether they were

15  willfull." (Doc. 12 at 11.)   This argument, which focuses largely

16  on factual issues in the state action, seemingly overlooks the

17  nature of the inquiry in the *Pullman* context.   *Pullman* is concerned

18  with unclear issues of "state *law*," *Spoklie*, 411 F.3d at 1055

19  (emphasis added), not unclear issues of fact.   *Pullman* deals with

20  whether the resolution of unclear issues of state law in a state

21  action could moot or narrow a federal constitutional question in a

22  federal court case.

23       The constitutional dimensions of this case are encompassed in

24  the § 1983 claim.   In that claim, Plaintiffs assert a violation of

25  the Fourth Amendment's prohibition on unreasonable seizures, a

26  violation of substantive due process rights under the Fourteenth

27  Amendment, and retaliation in violation of the First Amendment's

28

free speech provision.   The inquiry, under *Pullman,* is whether there are unclear issues of California law that could moot or narrow a federal constitutional question raised by these claims. Defendants identify two allegedly unclear areas of state law.   The first concerns the "Hughes Bill" and the second relates to whether a truancy notice is privileged or entitled to immunity under California law.

<u>     1.   Unclear Areas Of State Law</u>

<u>          a.   The Hughes Bill</u>

Defendants argue that "a State Court ruling on whether the Hughes Bill was violated, and whether it creates any sort of mandatory duty on the part of school employees, may very well narrow or eliminate the need for this Court to pass on Constitutional issues." (Doc. 12 at 11.)   Defendants fail to specify even one "Constitutional issue[]" to which they are referring.   From a review of the Hughes Bill and the pleadings, it appears the Hughes Bill relates, if at all, to the Fourth Amendment unreasonable seizure claim and possibly the Fourteenth Amendment substantive due process claim.

The Hughes Bill is concerned with the procedures used by schools to address behavioral problems in special education students.   The Hughes Bill is codified in California Education Code §§ 56520-56524 and is further implemented by corresponding California regulations.

The California Education Code states that the procedures used for "the elimination of maladaptive behaviors" in special education students, like I.K., "shall not include . . . those that cause pain

or trauma." Cal. Educ. Code § 56520(a)(3).  In addition, when behavioral interventions are used" on a pupil they must be used "in consideration of the pupil's physical freedom and social interaction, [and] be administered in a manner that respects human dignity and personal privacy, and that ensure[s] a pupil's right to placement in the least restrictive educational environment." Cal. Educ. Code § 56520(b)(1).  The California Education Code directs the State Board of Education to adopt regulations governing the use of behavioral interventions on special education students. Cal. Educ. Code § 56523. These regulations appear in Title 5 of the California Code of Regulations, § 3052.

Section 3052 regulates the development and implementation of "behavioral intervention plans."  These plans specify appropriate interventions to be used when a student's behavioral problems arise and aim to "replace specified maladaptive behavior(s) with alternative acceptable behavior(s)." Cal. Code Regs. tit. 5, § 3052(a)(2).  A student's behavioral intervention plan is formulated after "a functional assessment" of the student, must be "specified in the individualized education program," and "used only in a systematic manner in accordance with the" regulations. § 3052(a)(3).

Apart from any planned behavioral interventions set forth in a student's behavioral intervention plan, § 3052(i) permits "emergency interventions" in certain limited circumstances.  "To prevent emergency interventions from being used in lieu of planned, systematic behavioral interventions," however, "the parent and residential care provider, if appropriate," must "be notified

**36**

within one school day whenever an emergency intervention is used."
§ 3052(i)(5).

Finally, § 3052 forbids certain forms of behavioral interventions. Specifically, § 3052(l) prohibits a "public education agency" and any "nonpublic school or agency serving individuals pursuant to Education Code Section 56356 et seq." from authorizing, ordering, consenting to, or paying for "any of the following interventions, or any other interventions similar to or like the following":

> (1) Any intervention that is designed to, or likely to, cause physical pain;
>
> (2) Releasing noxious, toxic or otherwise unpleasant sprays, mists, or substances in proximity to the individual's face;
>
> (3) Any intervention which denies adequate sleep, food, water, shelter, bedding, physical comfort, or access to bathroom facilities;
>
> (4) Any intervention which is designed to subject, used to subject, or likely to subject the individual to verbal abuse, ridicule or humiliation, or which can be expected to cause excessive emotional trauma;
>
> (5) Restrictive interventions which employ a device or material or objects that simultaneously immobilize all four extremities, including the procedure known as prone containment, except that prone containment or similar techniques may be used by trained personnel as a limited emergency intervention pursuant to subsection (i);
>
> (6) Locked seclusion, except pursuant to subsection (i)(4)(A) [which deals with emergency interventions];
>
> (7) Any intervention that precludes adequate supervision of the individual; and
>
> (8) Any intervention which deprives the individual of one or more of his or her senses.

§ 3052(l)(1)-(8).

              i.    **The Hughes Bill And The State Case**

37

1     From the face of the state court complaint, it is not entirely

2 clear which specific provisions of the Hughes Bill are at issue.

3 Plaintiffs' state court complaint only provides a general reference

4 to the "Hughes Bill" and its associated regulations, i.e., "§

5 3052," in a few instances.

6     During the Mrs. Forcade incident, Barries allegedly restrained

7 I.K. so that he could not move.  The state court complaint alleges

8 that "[n]o incident report was completed or provided to [I.K.'s

9 parents] to show that the restraint" employed by Barries during the

10 Mrs. Forcade incident "was in compliance with the Hughes Bill and

11 Title 5."  In the claims for battery and assault, the state court

12 complaint alleges that Barries and the School District "breached

13 their duty of care under California Education Code §§ 44807 and

14 49000, California Penal Code § 1165.4 and *5 C.C.R. § 3052.*"

15 (Emphasis added.)  In the NIED claim, the state court complaint

16 alleges:

17     **70.  Furthermore, Defendants TRACY Barries and SUSD had
      a duty under the Hughes Bill, 5 C.C.R. 3052, to provide**
18    **positive behavior interventions to students and were
      forbidden from using aversive or negative behavior**
19    **interventions with students. . . .**

20    **74.  Mr. Barries and SUSD further breached their duties
      by using and/or allowing the use of adverse and/or**
21    **negative behavior interventions including, but not
      limited to, spitting on I.K., breaking his sunglasses,**
22    **restraining him, and pulling him to the floor in
      violation of the Hughes Bill. . . . These breaches of**
23    **duty constitute negligence per se.**

24              ii.  <u>The Hughes Bill And The Federal Case</u>

25     In Plaintiff's federal complaint, the § 1983 claim is the only

26 claim that gives rise to federal constitutional issues.  In the §

27 1983 claim, there is no explicit mention of the Hughes Bill or its

28
                                    38

associated regulations.  Nevertheless, some of the underlying *facts* in the state court complaint which appear to be tied to the Hughes Bill and § 3052 are also mentioned in the federal complaint in the § 1983 claim.   For example, with respect to the alleged Fourth Amendment violation, the complaint alleges that by "improperly restraining" I.K., Barries "unreasonably seized I.K. in violation of his constitutional rights."  Whereas, in the state court action, an improper restraint of I.K. implicates the Hughes Bill or § 3052, in the federal action, an improper restraint implicates the Fourth Amendment.   Similarly, with respect to the Fourteenth Amendment substantive due process claim, the federal complaint alleges that "by spitting on him and pulling him off a desk, TRACY BARRIES engaged in actions that shock the conscience and were an arbitrary exercise of government power."  In the state court action, these same actions are alleged to constitute instances where Barries violated the Hughes Bill and committed negligence per se.

Assuming facts underlying the Fourth and Fourteenth Amendment claims overlap with the facts surrounding the Hughes Bill issues in the state court pleading, Defendants' argument that "a State Court ruling on whether the Hughes Bill was violated, and whether it creates any sort of mandatory duty on the part of school employees, may very well narrow or eliminate the need for this Court to pass on Constitutional issues" (Doc. 12 at 11) is still unpersuasive. Even if these are "unclear areas" of California law, and even if the state court reaches these issues and concludes that the Hughes Bill was or was not violated or that it does or does not create a mandatory duty on the part of school employees, these state law

1   determinations would not dictate whether a violation of the Fourth
2   or Fourteenth Amendment occurred or otherwise narrow the contours
3   of any apparent constitutional question.

4       A "[m]ere violation of a state statute does not infringe the
5   federal Constitution," *Snowden v. Hughes*, 321 U.S. 1, 11 (1944),
6   and a violation of state law "does not necessarily mean that
7   federal rights have been invaded," *Paul v. Davis*, 424 U.S. 693, 699
8   (1976) (internal quotation marks omitted). *See also Weiner v. San*
9   *Diego County*, 210 F.3d 1025, 1032 (9th Cir. 2000) ("To establish a
10  civil rights claim under 42 U.S.C. § 1983, a plaintiff must assert
11  more than a violation of state tort law-he must show that the
12  defendant deprived him of an interest protected by the Constitution
13  or federal law."). Accordingly, even if the state court concludes
14  that the Hughes Bill placed a mandatory duty on the part of school
15  employees and that the Hughes Bill was violated, this would not
16  resolve whether I.K., or any plaintiff, was deprived of a federal
17  constitutional right.

18      On the other hand, even if the state court concludes that the
19  Hughes Bill was not violated, or does not create any mandatory duty
20  on the part of school employees, this would not bar Plaintiffs from
21  proving a deprivation of a federal constitutional right. *See Smith*
22  *v. Cremins*, 308 F.2d 187, 188 (9th Cir. 1962) (recognizing that if
23  an officer's conduct "deprived [the plaintiff] of federal
24  constitutional rights, it would be no defense that the conduct was
25  authorized by municipal enactments"); *see also Hampton v. Dillard*
26  *Dept. Stores, Inc.*, 247 F.3d 1091, 1108 n.4 (10th Cir. 2001)
27  ("[C]ompliance, or the lack of compliance with a state statute is

28
                                    **40**

1  not the yardstick against which to assess a claimed federal

2  constitutional violation.") (internal quotation marks omitted).

3      Examining more closely the particular constitutional issues

4  involved, with respect to the Fourth Amendment unreasonable seizure

5  claim, "the reasonableness of a seizure depends *exclusively* on

6  federal law." *United States v. Becerra-Garcia*, 397 F.3d 1167, 1173

7  (9th Cir. 2005) (emphasis added). "Compliance with state law does

8  not determine [the] constitutional reasonableness" of a seizure.

9  *Id.* at 1173 n.3.[11]  Accordingly, compliance or non-compliance with

10 the Hughes Bill does not dictate whether any seizure of I.K. was

11 constitutionally reasonable under the Fourth Amendment.  Nor, based

12 on the pleadings, was any seizure of I.K. predicated on his

13 violation of the Hughes Bill such that reference to the Hughes Bill

14 is analytically required for a probable cause/reasonable suspicion

15 determination. *See, e.g., Torres v. City of Los Angeles*, 548 F.3d

16 1197, 1207 (9th Cir. 2008); *United States v. King*, 244 F.3d 736,

17 739-40 (9th Cir. 2001).

18     With respect to the Fourteenth Amendment substantive due

19 process claim, the test alluded to in the federal complaint, which

20 the Ninth Circuit uses, is "the 'shocks the conscience' test."

21 *Fontana v. Haskin*, 262 F.3d 871, 882 (9th Cir. 2001).[12]  To

22

23     [11] The Ninth Circuit has recognized two exceptions to this

24 rule – searches incident to arrest and inventory searches, *Becerra-*

    *Garcia*, 397 F.3d at 1173 n.3, neither of which are applicable here.

25

26     [12] No opinion is expressed on whether it is appropriate for

27 Plaintiffs to advance a Fourteenth Amendment substantive due

    process claim. *See Fontana*, 262 F.3d at 881-82 ("If a

27 constitutional claim is covered by a specific constitutional

28

establish a substantive due process violation, "[t]he threshold question is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* at 882 n.7 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)). The answer to this *federal* constitutional question does not depend on whether *state* law was violated. *See Lewis*, 523 U.S. at 854 n.14 ("To say that due process is not offended by the police conduct described here is not, of course, to imply anything about its appropriate treatment under state law."); *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005) (recognizing that "[m]ere violations of state law, even violations resulting from bad faith, do not necessarily" shock the contemporary conscience and give rise to Fourteenth Amendment liability). Conscience-shocking behavior contravenes the "*universal* sense of justice." *Lewis*, 523 U.S. at 850 (internal quotation marks omitted) (emphasis added).

Whatever relevance the Hughes Bill and its associated regulations may have in the federal constitutional litigation, Defendants have not demonstrated that a resolution of the state law issues surrounding the Hughes Bill might moot an issue of federal constitutional law or narrow the contours of a constitutional question in any material way. Absent such a showing, *Pullman* abstention is not warranted.

b.   <u>Privilege/Immunity Under California Law</u>

provision ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.") (internal quotation marks omitted).

42

1    Defendants argue that "[n]o California court has clearly
2    decided whether a truancy notice is privileged under Civil Code
3    section 47(a) or (b), or subject to immunity under the Government
4    Code.   Resolution of these issues of State law will narrow or
5    eliminate the need for any constitutional determinations." (Doc. 12
6    at 12.)   Once again, Defendants have not specifically identified
7    any of the "constitutional determinations" to which they refer.

8        In the state court complaint, Antracoli's sending of the
9    truancy notice is identified as an act of retaliation that violated
10   the Unruh Civil Rights Act, and is also implicated in the IIED and
11   NIED claims.   In the federal complaint, Antracoli's sending of the
12   truancy notice is identified as an act of retaliation that violated
13   the First Amendment.

14       Even assuming that whether a truancy notice is privileged
15   under Civil Code section 47(a) or (b), or subject to immunity under
16   the Government Code, represents an unclear area of California law,
17   and further assuming that the state court reaches these issues and
18   concludes that a truancy notice is or is not privileged or entitled
19   to state law immunity under the Government Code, these state law
20   determinations would not resolve whether the First Amendment was
21   violated or otherwise narrow any apparent constitutional question.

22       It is axiomatic that "[c]onduct by persons acting under color
23   of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3)
24   cannot be immunized by state law." *Howlett ex rel. Howlett*, 496
25   U.S. at 376 (internal quotation marks omitted); *see also Stroh*, 205
26   F.3d at 1160.   "State immunity law does not govern § 1983 claims."
27   *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996) (concluding that

28

**43**

California's litigation privilege under California Civil Code §
47(b) did not apply to the plaintiff's § 1983 claim); *see also*
*Wallis*, 202 F.3d at 1143-44 ("Immunity under § 1983 is governed by
federal law; state law cannot provide immunity from suit for
federal civil rights violations."). Even if the truancy notice was
privileged under Civil Code section 47(a) or (b), or otherwise
subject to immunity under the California Government Code, this does
not dictate whether an actionable violation of the First Amendment
occurred.

Whatever relevance the state law immunities may have in the
federal constitutional litigation, Defendants have not demonstrated
that a resolution of the state law issues surrounding these
immunities might moot an issue of federal constitutional law or
narrow the contours of a constitutional question in any material
way. Absent such a showing, *Pullman* abstention is inappropriate.

Defendants request for a *Pullman* stay is DENIED without
prejudice.

D.    *Burford*

*Burford* is the last ground upon which Defendants request a
stay. "*Burford* protects complex state administrative processes
from undue federal interference." *Gilbertson v. Albright*, 381 F.3d
965, 974 n.9 (9th Cir. 2004). In the Ninth Circuit, abstention
under *Burford* is only appropriate where:

> (1) . . . the state has concentrated suits involving the
> local issue in a particular court; (2) the federal issues
> are not easily separable from complicated state law
> issues with which the state courts may have special
> competence; and (3) ... federal review might disrupt
> state efforts to establish a coherent policy.

1  *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671 (9th Cir. 2004).

2  *Burford* abstention is not appropriate where state law does not

3  concentrate judicial review in a particular or specialized court.

4  *See, e.g.*, *S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 806 (9th Cir.

5  2002); *City of Tucson v. U.S. W. Commc'ns*, *Inc.*, 284 F.3d 1128,

6  1133 (9th Cir. 2002).

7          There is no indication, or argument from Defendants, that

8  California concentrates suits involving the state law issues

9  implicated here in any particular or specialized court.  Because

10  this threshold requirement is not met, *Burford* abstention is not

11  warranted.

12          In addition, to the extent issues of state law even need to be

13  considered in this federal case, there is no indication that doing

14  so would unduly interfere with any complex state administrative

15  process.    This case does not implicate principles of *Burford*.

16  *Gilbertson,* 381 F.3d at 974 n.9*; see also Hawthorne Savings F.S.B.*

17  *v. Reliance Ins. Co. of Ill.*, 421 F.3d 835, 848 (9th Cir. 2005),

18  amended by 433 F.3d 1089.

19  _____Defendants have not demonstrated that a stay under *Burford* is

20  appropriate.    Defendants' request for a *Burford* stay is DENIED

21  without prejudice.

22  *//*

23  *//*

24  *//*

25  *//*

26  *//*

27  *//*

28                                           **45**

## IV.   CONCLUSION

For the reasons stated, Defendants' request for a stay of this case under *Landis*, *Colorado River*, *Pullman*, and *Burford* is DENIED without prejudice.  Although Defendants' motion is denied, through appropriate case management and scheduling, the court is willing to work with the parties to structure the federal litigation to achieve efficiency and economy for all parties.

IT IS SO ORDERED.

Dated:    **January 20, 2010**                    _____/s/ Oliver W. Wanger_____
                                                  UNITED STATES DISTRICT JUDGE

**46**